Northwestern Mutual®

| | | | |
|---|---|---|---|
| To: | Patricia Wotnoske | Report: | Digital Photo |
| From: | Jerry Bonney | Insured: | Virgle W. Mc Ever III |
| Date: | 6/28/12 | Claim #: | C155160 |

## INVESTIGATIVE REPORT

Date of Photograph: 6/28/12
Location: Insured's residential area and home

Insured





DEFENDANT'S EXHIBIT D-03

NM-001390

CONFIDENTIAL: Do not re-disclose or reproduce without prior written consent from Northwestern Mutual - Date 09/06/2019

Moody Rd, which is a 4-lane highway leaving Insured's street (Hickory Lane), which is just past the street on the right, but actually on the left side of this photo.





CONFIDENTIAL: Do not re-disclose or reproduce without prior written consent from Northwestern Mutual - Date 09/06/2019

Looking at the entrance to Hickory Lane, Bonaire, GA as turning off of Moody Rd.







CONFIDENTIAL: Do not re-disclose or reproduce without prior written consent from Northwestern Mutual - Date 09/06/2019

Insured's driveway at 107 Hickory Lane, Bonaire, GA is directly ahead on the center left leading up a slight hill. The driveway begins off of the dead-end cul-de-sac at the end of Hickory Lane.







CONFIDENTIAL: Do not re-disclose or reproduce without prior written consent from Northwestern Mutual - Date 09/06/2019

Northwestern Mutual®

| | | | |
|---|---|---|---|
| To: | Patricia Wotnoske | Report: | Final |
| From: | Jerry Bonney | Insured: | Virgle W. McEver III |
| Date: | 6/29/12 | Claim #: | C155160 |

# INVESTIGATIVE REPORT

**Virgle W. McEver III**
**107 Hickory Lane**
**Bonaire, GA 31005**
**478-922-9561 home**
**478-747-1952 cell**

On 6/28/12, I met with the Insured at his residence at about noon as prearranged. The Insured was cooperative throughout the interview, which lasted until approximately 1:40 p.m. The Insured's wife was home, but remained out of the immediate room while the interview was being conducted. She did walk through the kitchen at one point and I was introduced to her. The Insured allowed me to take a digital photo of him and a short video clip of him discussing and moving his right hand, which have been attached to the DIBC.

## INTERVIEW

### Description and demeanor

The Insured greeted me with a firm handshake at the front door of his residence and invited me into a small sitting area off of the kitchen, where the interview was conducted. The Insured was dressed in business casual attire and appeared to be his stated age of 58 years. He is described as being about 5'7" tall, 160 pounds, with medium-short, curly, blondish hair, which was receding and thinning on top.

The Insured was cooperative and cordial throughout the interview and responded to all questions asked of him in a direct manner without any undue hesitancy. During the course of the interview, I observed the Insured sitting, standing up, and walking without any noticeable signs of discomfort or limitation and none was noted by him. I also observed the movements of his right hand as much as I could during the interview and did not casually notice limited range of motion, nor did he grimace or wince if he moved it incorrectly.

The Insured has not pursed additional treatment for his right hand in effort to assist in further healing of it.



CONFIDENTIAL: Do not re-disclose or reproduce without prior written consent from Northwestern Mutual - Date 09/06/2019

**Residence**

The interview was conducted at the Insured's residence, which is described as large, grayish-white, stucco-faced, two story home set up on a hill and surrounded by foliage. The home is situated at the end of a short street with similar large homes set on large properties.

No vehicles were visible at the time of my visit.

Surveillance, if considered, in the immediate area is not viable due to the nature of the neighborhood. The Insured's street sits off of a busy, four lane road with no immediate parking areas. To be viable, surveillance, would need to cover two directions of travel and staged from a distance away of the Insured's street.

However, surveillance may be viable next month when the Insured travels to an Inn on Mohegan Island, ME.

**Medical**

This is an active claim with an established onset date of 9/28/11 due to an injury to his right, dominant hand, which resulted in surgery and ongoing limitations preventing him from working as a General Surgeon. A COD was requested to gather updated information concerning his limitations and activities. He provided the following response:

I asked the Insured to review his medical care and treatment, dating from his surgery on 9/28/11 to the present time.

He recalled that Dr. Spivey did the surgery to his right hand. He last saw him on Monday, 6/25/12, which was his 9 month follow-up with "no change" to his medical condition. Dr. Spivey examined his right hand / wrist and advised him that there was no real change to his range of motion limitations or nerve damage. He will see him again in 3 months. He did see him prior to Monday in 4/2012, 2/2012, 1/2012, 12/2011, and 11/2011.

Dr. James Spivey is listed in the DIBC.

Dr. Spivey did initially suggest physical therapy and gave the Insured the "option" to do it at home or a facility. The Insured decided to do the therapy on his own at home. However, he is no longer doing any therapy at home. He was advised he didn't need to do it any longer. He said he was doing certain things with a ball that ended up causing swelling on the top of his wrist as well as causing pain so he stopped doing it.



CONFIDENTIAL: Do not re-disclose or reproduce without prior written consent from Northwestern Mutual - Date 09/06/2019

He was asked by Dr. Spivey if he wanted to do another operation called "Tenolisys" (ph) for the nerve, but it only had a 50/50 chance of helping. He decided not to pursue that.

The Insured has also continued to treat with Dr. Dopson at Resurgent's Orthopedics in Atlanta, GA. He actually saw him for a second opinion in 9/2011, but has since seen him in 10/2011, 11/2011, 12/2011, and 3/2012. He does not need to see him again until 9/2012. Dr. Dopson's opinions "mirrored" Dr. Spivey, he stated. Dr. Dopson has not recommended any further treatment.

Dr. Thomas Dopson is listed in the DIBC.

The Insured's Family Physician is Dr. Rick Smith in Warner Robins, GA, but he has not seen him in 2 years.

The Internet lists Dr. Richard L. Smith at 1260 Russell Pkwy, Warner Robins, GA 31088 #478-929-4100.

The Insured did see one of his partners, Dr. Bobbie Campbell, for a colonoscopy in 2011 in which he removed 3 small polyps. He will see him again in a year for another colonoscopy. The Insured did not see the pathology report regarding the polyps.

He has not treated with anyone else since 9/2011, nor has he been hospitalized outside of the colonoscopy, or had an ER visit.

I asked if he had seen a hand surgeon or followed up with one since the surgery for another opinion. He said Dr. Dopson asked if he was comfortable with Dr. Spivey and the Insured said he was.

I asked if he was still wearing the thumb brace. He said no. He opined that he stopped wearing it in 3/2012. However, if he is doing something such as pulling weeds in the backyard he will put it on. He was told he didn't need to wear the brace unless he was doing something that might require lifting or picking something up such as limbs in his yard or weeding.

As for formal physical therapy or occupational therapy, the Insured felt that he didn't need it.

I asked if his doctors recommended or suggested further treatment such as wax therapy or desensitization therapy and he said it wasn't mentioned or recommended. He has not sought additional treatment or other physician opinions on his own. He is following his doctor's advice.

He will continue seeing his doctors as requested to monitor his progress. If he has any changes to his condition, whether positive or negative, he is to let them know and he can see them sooner, if needed.



CONFIDENTIAL: Do not re-disclose or reproduce without prior written consent from Northwestern Mutual - Date 09/06/2019

At this point, I explained to the Insured the need to remain under the continued care of a licensed physician appropriate to his medical condition to provide us with ongoing, objective medical documentation to support his limitations whether partial or total. He acknowledged his understanding.

**Medication**

The Insured is currently taking the following medications, which he gets from Medicine Shoppe or now Walgreen's Pharmacy:

Loretadine, 10 mg, daily
Tylenol Extra Strength or Ibuprofen, if his right hand / wrist aches or swell

He was prescribed a long-acting anti-inflammatory by Dr. Dopson, but he couldn't remember its name or the last time he took it.

I asked when he last took anything for his right hand / wrist and he replied that he took some when he returned from his 24 day cruise in Europe due to handling luggage, which caused some swelling. He took some anti-inflammatories a couple of times a day for a couple of days.

Other than the swelling from handling luggage on the cruise, it has been a while since he used any medication because he is limited in what he can do with his right hand and he knows that if he manipulates this thumb and wrist incorrectly, he will have pain and swelling so he avoids anything that would cause that.

As for taking any prescription pain medication post op, he told his surgeon, Dr. Spivey, that he only wanted to take anti-inflammatory agents, which is what Drs. Dopson and Spivey gave him.

**Symptoms and limitations**

The Insured was asked to describe his current symptoms starting with the most prominent and working downward. He began by stating his biggest problem is the limitation of range of motion of her right hand / wrist. If he tries to rotate his wrist or bring back or push his hand up and back, it will cause pain and swelling. The pain will be at the time of the action. It can be a sharp pain and can persist for several minutes at a pain level of 5 or 6 on a scale of 1 to 10 with 10 being the highest degree of pain. The swelling can last several days as it accumulates.

He also has difficulty grasping with his right hand. He opined that he could grasp and hold a 2 ounce glass of water, but greater than a 4 ounce glass of water would cause acute pain on the medial aspect of his right thumb.

Additionally, any bending of his thumb with pressure causes "significant pain". At this time, if he tries to hold a plate full of food with his right hand using his thumb to press





CONFIDENTIAL: Do not re-disclose or reproduce without prior written consent from Northwestern Mutual - Date 09/06/2019

down on the top of the plate while holding it, it will cause acute pain along the length of his thumb to his wrist similar as it did prior to surgery, but to a lesser degree.

He opined that his symptoms are “40% better” than what they were prior to surgery.

He commented that prior to surgery and even now, he still can’t wipe his butt with his right hand.

If he tries to pick something up, for example pine straw, he stated, he has no dexterity. He has numbness, “pretty much 100%” on the medial aspect of his right thumb.

His grip strength has also changed and is not equal with both hands. Both of his doctors have checked it. They didn’t tell him a measurement of the grip strength, but he opined that his right hand is “20 to 30% less” strong as compared to his good, left hand. He does, however, “do pretty good” with gripping with his 4 right fingers.

He can make a fist with his right hand, but only with the thumb on the outside of his fingers. He cannot make a fist with his thumb under his fingers.

As far as ADLs, he can shave with his right hand on the right side of his face. Doing small collar buttons at times is a problem for him and he has to have his wife help him. He can eat okay with his right hand. Working on the computer is okay. As for driving, he has switched more to his left hand. He tries to avoid having his right hand at 2 p.m. on the wheel or at the bottom of the steering wheel.

Sitting, standing in place, and walking are fine with no limitations.

Around the house, he can do simple things with his right hand such as watering the plants as long as he doesn’t rotate his hand. They have someone cutting the grass and doing handyman stuff for him. His wife cleans the swimming pool.

As for his work as a general surgeon, he doesn’t have the strength, range of motion, or dexterity to do surgery. He can’t work and use the thumb brace as it wouldn’t be sterile for surgery.

**Daily activities**

The Insured was asked to describe his daily activities for the previous day, Wednesday, 6/27/12. He recalled that yesterday they had grandchildren over so instead he discussed Tuesday, 6/26/12. He recalled that he got up about 7:30 a.m. and had coffee and talked his wife for about 1.5 hours. He went for his almost daily walk up to the beginning of their street and back, which he described as about 8 to 11 trips or 3.2 to 4.2 miles. It takes him about 1.5 to 2 hours to do the walk, which he does about 4 days a week. He then read for a while, checked the mail, and did some errands. He read some more and watered the plants. He later met a friend and they went for a drive for about 2 to 3 hours. Asking if he went anywhere particular or did anything specific, he replied that they just





CONFIDENTIAL: Do not re-disclose or reproduce without prior written consent from Northwestern Mutual - Date 09/06/2019

meandered around and added he likes to travel. He came home, had dinner, and stayed in for the rest of the night.

As for doing any volunteer activities, he said nothing now.

He then pointed to a book on the end table, which was titled A 1000 Places To See in the US. He said they love to travel and he wants to see as much as he can. They just returned from a 24 day cruise in the Mediterranean. Talking about travel, he said he is trying to plan a trip to Africa next year with 2 other couples.

As for other travel in 2012, they have been to UT twice as his daughter, who lives in Park City, UT. They have also been to NYC and Las Vegas. In the next 4 weeks, they will be going to an Inn on Mohegan Island, ME. They will also go back to UT and are going to the Polynesian Islands in 9/12 or 10/12.

At the present time, he is not taking any courses, but his CE courses for his medical license are current. He did find free on-line courses of almost any nature through Kahn Academy. Because he misses the every-day learning experience of surgery, he is considering taking all of his college courses over on-line. He commented that it has been 9 months already since his surgery and it looks like there will be no return to work for him so he needs to do something else creative. He looked into 6 or 8 courses the day before and thinks he will take a calculus course.

He does not attend any meetings on a regular basis.

As for hobbies, he said he enjoys photography and reading. I asked if it was difficult to shoot photography with his right hand and he said no because he just has a point and shoot camera.

I asked about hunting and he said he used to enjoy hunting for deer and birds, which he did sporadically in the past. He might go bird hunting a couple of times a year and during deer season, he would go 5 or 6 times. Asking if did any hunting this past year he said no. However, he did go out and try to shoot his 308 rifle in 11/2012. He realized that he only needs to pull the trigger and doesn't need to use his thumb to hold the rifle in place while shooting right-handed. He did wear his thumb brace when he attempted it. He only shot about 5 rounds at a target to see how it felt.

As for sporting activities, he said he used to play golf, but hasn't done so in 2 years and doesn't think he could do it because he can't grip with his right hand as necessary when holding a club.

He does like to hike and wants to do the Appalachian Trail, which is a goal over the next 10 years. When he does go hiking there, he will hike for 1 or 2 days at a time and go about 12 miles a day.



CONFIDENTIAL: Do not re-disclose or reproduce without prior written consent from Northwestern Mutual - Date 09/06/2019

He has no other business activities at this time. I asked him about Virgil Mc Ever Probation in Perry, GA and he said his father was a City Commissioner, who has since passed away and they named the facility after him. He still has a share of stock in Patient Select, which he is trying to sell to one of his former partners.

He does not belong to a health club and only exercises at home.

**Insurance**

The Insured's health insurance coverage is with Coventry

He has additional LTD disability insurance coverage outside of NM with Reliance Standard and is receiving $7,951 per month in benefits to age 65.

The Insured has not applied for SSDI benefits, but Reliance is "hounding" him to do so. He said he is going to talk to an attorney next week to see if it is necessary. He commented that both of his Orthopedics told him he probably wouldn't qualify for SSDI. I suggested that if his policy has an offset requirement for SSS benefits, he might have to apply just to satisfy that requirement even if he is denied benefits. I further advised him that his policies with NM do not have an SSS benefit.

**Tax returns**

Prior to interview, the Insured submitted his personal and business tax returns from 2008 through 2010. When I asked for copies of his 2011 personal and business tax return he stated he had just sent them into the Home Office.

**Authorizations**

The Insured indicated he had just returned a signed medical authorization to the Home Office along with his 2011 tax returns.

**Employment**

**Surgical Associates of Warner Robins, GA**
**1701 Watson Blvd**
**Warner Robbins, GA**
**478-923-0144**

The Insured was a 25% owner of the above General Surgery practice. There were 4 General Surgeons in the practice and about 20 to 21 staff.

The Insured's basic work schedule was as follows:

Monday, Wednesday, and Friday – scheduled surgery 7 a.m. to 5+ p.m.
` Tuesday, 7-9 a.m. surgery followed by office hours to 5 p.m.





CONFIDENTIAL: Do not re-disclose or reproduce without prior written consent from Northwestern Mutual - Date 09/06/2019

Thursday, 7-9 a.m. surgery followed by office hours to 5 p.m.

The Insured had call every 4th night, which would add another 2 or 3 hours to his day, and every 4th weekend.

He did about 10 to 12 surgeries a day, which were mainly endoscopies, GI surgeries, breast, and colon-rectal surgeries. Most of his surgeries on Tuesday and Thursdays were endoscopies.

In the office, he saw about 40 to 50 patients for consults and pre and post op visits. All office visits were surgery related.

He usually did rounds at the end of his day unless a patient was in intensive care and then he would see them twice.

His surgeries were done at Houston Medical Center in Warren Robins, GA.

I reviewed his Request for Disability Benefits package listed his duties as follows for 12 hours a day / 60+ hours a week, which he affirmed as being correct:

| | |
|---|---|
| 85% | OR |
| 10% | Office |
| 2.5% | Pre / post of care |
| 2.5% | rounds |

He worked basically full time up to his surgery on 9/28/11. He has not returned to work since that time.

The partnership was set up that if someone went on disability, the group had the option of letting that partner go after the 91-day waiting period of their policies, which they did to him. He stated he was not planning to stop working at his age. He had expected to work until age 70.

He opined that if he was able to return to work, which isn't likely, he would either have to go out on his own or work for a hospital. I asked if he thought about teaching and he replied that it did cross his mind.

I commented that it appeared that they had hired another surgeon in 7/2011. He said they hired Dr. Silvy Harrington. I asked why they hired her at that time. He explained that the hospital where they did surgeries was putting pressure on them to enlarge their practice or they would bring in another surgical group. His group thought about expanding to 5 or 6 surgeons to accommodate the hospital. However, the hospital hired 2 of its own surgeons so the group decided to stay at their present level of 4 surgeons since the Insured can't return to work.





CONFIDENTIAL: Do not re-disclose or reproduce without prior written consent from Northwestern Mutual - Date 09/06/2019

**Digital photo / video taken of hand**

The Insured allowed me to take a digital photo of him and a short video clip of the movement of his right hand, which have been attached to the DIBC.

**Internet**

A Google search located the following identifiable references for the Insured:

http://www.surgicalassociateswr.com/page2.html (photo)

http://www.surgicalassociateswr.com/

http://www.manta.com/c/mtwjpry/virgil-mc-ever-probation - possible business entity

**Benefits**

I reminded the Insured of the need to remain under the continued care of a licensed physician providing us with ongoing, objective medical documentation to support his limitations whether partial or total.

I advised him we would continue to administer his claim on an ongoing basis to assess whether he continues to remain either partially or totally disabled.

I commented that we may consider sending him to an Independent Medical Exam for further insight into his medical condition. I pointed out that we did have a paper review of his medical records by a Hand Surgeon, who questioned the extent of his treatment noting that the Insured did not have formal therapy, nor did he purse additional treatment such as wax therapy or desensitization therapy, which might help his medical condition.

I pointed out that his policies are to age 65 with possible lifetime benefits, which require him to be considered totally disabled by the policy anniversary date of his 60th birthday and remain totally disabled through the policy anniversary date of his 65th birthday.

---



CONFIDENTIAL: Do not re-disclose or reproduce without prior written consent from Northwestern Mutual - Date 09/06/2019