## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| DR. VIRGLE W. MCEVER, III, | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO. **5:19-cv-00394-TES** |
| NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, | |
| *Defendant.* | |

## VERDICT

"If a surgeon can't operate, is he really a surgeon?"

That's the question that the Court must answer in this case.

Plaintiff, Dr. Virgle W. McEver, III ("Dr. McEver"), a surgeon by training, contends that he injured his right hand so severely that he can no longer perform the essential duties of a surgeon as he did before his injury. Northwestern Mutual Life Insurance Company ("Northwestern Mutual") says that even if he can't operate exactly as he could before his injury, he can perform some surgeries so that he should only be considered "partially disabled" from his regular occupation.

Dr. McEver filed this action against Northwestern Mutual to continue receiving disability benefits under five policies of disability income insurance (collectively "the Disability Policies") he purchased from it, as well as waiver-of-premium benefits under

three life insurance policies (collectively "the Life Policies")[1] that he would have received had Northwestern Mutual determined him "totally disabled," and not "partially disabled" following the injury to his right hand. [Doc. 1, pp. 2–3]; [Doc. 1-1]; [Doc. 9, pp. 1–3]. Additionally, Dr. McEver seeks to recover a penalty and attorney's fees under O.C.G.A. § 33-4-6, alleging that Northwestern Mutual acted in bad faith in denying him total-disability benefits under the Disability Policies and waiver of premium benefits under the Life Policies. [Doc. 1, pp. 2–3]; [Doc. 1-1]; [Doc. 9, pp. 1–3]. The parties consented to a bench trial on these issues. After considering all the evidence, testimony, and applicable law, the Court finds Dr. McEver to be "totally disabled" under both the Disability and Life Policies, but that Northwestern Mutual did not act in bad faith when it determined him only partially disabled under the Disability Policies and ineligible for waiver of premium benefits under the Life Policies.

## FINDINGS OF FACT[2]

A.     The Policies

1.     *The Disability Policies*

Between 1987 and 1992, Dr. McEver bought five individual disability insurance

---

[1] The Court will use "the Policies" when referring to both the Disability and Life Policies together.

[2] To the extent that any of the Court's factual findings may be considered conclusions of law or vice versa, they are to be considered as such. *See* Wright & Miller, *Federal Practice & Procedure*: Civil 3d § 2579, at n.2 (2022 update) (citing *Imprimis Int'l, Inc. v. Fraidenburgh*, No. CIV. S-04-1297 FCD DAD, 2007 WL 1576356, at *1, n.2 (E.D. Cal. May 31, 2007)).

policies from Northwestern Mutual.[3] [Doc. 26-1, pp. 1–2]. Each policy provided a monthly benefit if Dr. McEver became totally disabled or partially disabled, as defined by the Disability Policies. [Doc. 31-1]; [Doc. 31-2]; [Doc. 31-3]; [Doc. 31-4]; [Doc. 31-5]. When issued, the five Disability Policies provided combined monthly benefits of $17,820. [Doc. 26-1, p. 2, ¶ 3]. Under the Indexed Income Benefit provision of each Disability Policy, the combined monthly benefits had increased to $19,839.19 when Dr. McEver submitted his disability claim to Northwestern Mutual in January 2012. [Doc. 36, p. 63]; [Doc. 26-1, p. 2, ¶ 3].

Under the heading "GENERAL TERMS," each policy provides: "This policy provides benefits when the Insured is totally or partially disabled." [Doc. 31-1, p. 4]; [Doc. 31-2, p. 4]; [Doc. 31-3, p. 4]; [Doc. 31-4, p. 5]; [Doc. 31-5, p. 4]. Under the heading "FULL BENEFIT FOR TOTAL DISABILITY," each policy provides:

> The Full Benefit is payable for each month of your total disability between the Beginning Date and the end of the Maximum Benefit Period.
>
> **Total Disability**. Until the end of the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation. After the end of the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation and is not gainfully employed in any occupation.

---

[3] The Disability Policies are: (a) Policy No. D 573 004 issued December 30, 1987, providing a monthly disability benefit of $4,000 [Doc. 31-1]; (b) Policy No. D 647 265 issued January 22, 1989, providing a monthly disability benefit of $1,200 [Doc. 31-2]; (c) Policy No. D 706 948 issued November 12, 1989, providing a monthly disability benefit of $4,800 [Doc. 31-3]; (d) Policy No. D 753 342 issued June 12, 1990, providing a monthly disability benefit of $3,200 [Doc. 31-4]; and (e) Policy No. D 884 910 issued March 18, 1992, providing a monthly disability benefit of $4,000 [Doc. 31-5].

[Doc. 26-1, p. 3]; [Doc. 31-1, p. 4]; [Doc. 31-2, p. 4]; [Doc. 31-3, p. 4]; [Doc. 31-4, p. 5]; [Doc. 31-5, p. 4].

Under the heading "PROPORTIONATE BENEFIT FOR PARTIAL DISABILITY," three of the Disability Policies provided:

> The Proportionate Benefit is payable for each month of partial disability between the Beginning Date and the end of the Maximum Benefit Period.
>
> **Partial Disability**. The Insured is partially disabled when:
>
> a.      he is unable: to perform one or more of the principal duties of his occupation; or to spend as much time at his occupation as he did before the disability started; and
> b.      he has at least a 20% Loss of Earned Income.

[Doc. 31-1, p. 4]; [Doc. 31-2, p. 4]; [Doc. 31-3, p. 4].

Some Disability Policies provided a slightly different definition of partial disability, but the differences are immaterial to Dr. McEver's claims and Northwestern Mutual's defenses.[4] Each policy defined "occupation" to mean "the occupation of the Insured at the time he becomes disabled." [Doc. 31-1, p. 4]; [Doc. 31-2, p. 4]; [Doc. 31-3, p. 4]; [Doc. 31-4, p. 5]; [Doc. 31-5, p. 5]. Additionally, each policy provided that disability benefits were payable "only if . . . the Insured is under the care of a licensed

---

[4] Policy No. D 753 342 [Doc. 31-4] and Policy No. D 884 910 [Doc. 31-5] state the following: "The Partial Disability Benefit is payable for the first six months of partial disability following the Beginning Date and before the end of the Maximum Benefit Period. The amount of the Partial Disability Benefit is 50% of the Full Benefit." [Doc. 31-4, p. 5]; [Doc. 31-5, p. 5]. These policies then define "Partial Disability" by stating: "The Insured is partially disabled when: he is unable to perform one or more principal duties which accounted for at least 20% of the time he spent at his occupation before the disability started; or he has at least a 20% loss of time spent at his occupation." [Doc. 31-4, p. 5]; [Doc. 31-5, p. 5].

physician other than himself during the time he is disabled." [Doc. 31-1, p. 4]; [Doc. 31-2, p. 4]; [Doc. 31-3, p. 4]; [Doc. 31-4, p. 5]; [Doc. 31-5, p. 5]; [Doc. 26-1, p. 3].

Under the heading "LIFETIME BENEFIT FOR TOTAL DISABILITY," three of the Disability Policies provided at Section 1.7:

> [T]he Full Benefit is payable as long as total disability continues during the lifetime of the Insured, provided:
>
> • the Insured is totally disabled on the policy anniversary that follows his 60th birthday; and
>
> • the total disability continues beyond the policy anniversary that follows his 65th birthday.

[Doc. 26-1, p. 3]; [Doc. 31-1, p. 6]; [Doc. 31-2, p. 6]; [Doc. 31-3, p. 6].[5]

The maximum benefit period for partial disability was to each policy anniversary following Dr. McEver's 65th birthday. [Doc. 26-1, p. 3]; [Doc. 31-1]; [Doc. 31-2]; [Doc. 31-3]; [Doc. 31-4]; [Doc. 31-5]. Dr. McEver turned 65 in 2018. [Doc. 26-1, p. 3].

    2.   *The Life Policies*

Between 1990 and 1995, Dr. McEver purchased three life insurance policies issued by Northwestern Mutual, providing a combined death benefit of $2.5 million.[6] [Doc. 26-1, p. 2]; [Doc. 31-6]; [Doc. 31-7]; [Doc. 31-8]. The Life Policies require the

---

[5] Policy No. D 753 342 and Policy No. D 884 910 included similar language under Section 1.7, "LIFETIME BENEFIT FOR PRESUMPTIVE TOTAL DISABILITY." [Doc. 31-4, p. 7]; [Doc. 31-5, p. 6].

[6] The Life Policies are: (a) Policy No. 11 398 624 issued July 11, 1990 [Doc. 31-7]; (b) Policy No. 12 744 823 issued November 22, 1993 [Doc. 31-6]; and (c) Policy No. 13 235 585 issued February 22, 1995 [Doc. 31-8]. [Doc. 26-1, p. 2].

payment of combined annual premiums of $18,911.67. [Doc. 26-1, p. 2]; [Doc. 31-6];

[Doc. 31-7]; [Doc. 31-8].

The Life Policies provide waiver of premium benefits, subject to these provisions:

**Disability Before Age 60.** If total disability of the Insured starts on or before the policy anniversary nearest his 60th birthday, the Company will waive all premiums that come due on the policy as long as the total disability continues.

**Disability After Age 60.** If total disability of the Insured starts after the policy anniversary nearest his 60th birthday, the Company will waive those premiums that come due on the policy as long as the total disability continues, but only to the policy anniversary that is nearest his 65th birthday.

[Doc. 26-1, p. 4]; [Doc. 31-6, p. 21]; [Doc. 31-7, p. 20]; [Doc. 31-8, p. 18].

For waiver of premium benefits, the Life Policies defined Total Disability as

follows:

A total disability is one which prevents the Insured from engaging in an occupation. For the first 24 months of total disability, an occupation is the one that the Insured had at the time he became disabled. After 24 months, an occupation is one for which the Insured is qualified by education, training or experience. Due regard will be given to his vocation and earnings before he became disabled.

[Doc. 26-1, p. 4]; [Doc. 31-6, p. 21]; [Doc. 31-7, p. 20]; [Doc. 31-8, p. 18].

B.    Dr. McEver's General Surgery Practice

Dr. McEver made a living as a general surgeon, practicing in Warner Robins,

Georgia, until 2011. [Doc. 35, pp. 113–15, 151].[7] Dr. McEver was born on June 30, 1953.

---

[7] Docket entries 35, 36, and 37 refer to the three volumes of the trial transcript.

[Doc. 35, pp. 113–15]. When Dr. McEver submitted his claim for disability benefits, he was one of four general surgeons at Surgical Associates of Warner Robins who each owned a 25% share of the practice. [Doc. 36, pp. 54–55]. Although Dr. McEver and his three partners each had the same ownership interest in Surgical Associates, they did not receive an equal share of the net income of the practice. [Doc. 36, p. 55]. Instead, Dr. McEver received income based on the revenue he generated for Surgical Associates each year as the result of his own work. [*Id.*]. Dr. McEver made the following salary during his last three years of practice: $598,022.00 in 2009, $492,387.00 in 2010, and $446,978.00 in 2011. [Doc. 34-16]; [Doc. 34-17]; [Doc. 34-18]; [Doc. 36, pp. 59–60].

As a general surgeon, Dr. McEver performed a variety of surgeries. He performed vascular, noncardiac thoracic, and gastrointestinal surgeries as well as various cancer surgeries, including breast, colon, small bowel, and skin cancer. [Doc. 35, p. 116]. Additionally, he did "some reconstructive work for breast cancer," as well as "endoscopies such as gastroscopies, colonoscopies, bronchoscopies, [and] even did endoscopy of veins and arteries." [*Id.*]. Dr. McEver also performed trauma surgery for over 20 years, and primarily practiced at the Houston Medical Center in Warner Robins. [*Id.*].

In addition to Dr. McEver's testimony, the 2010 and 2011 Surgery Schedules, introduced into evidence by Northwestern Mutual and explained by Tracy McBride, Practice Manager of Surgical Associates, illustrate some of the specific surgeries Dr.

McEver performed. [Doc. 34-14]; [Doc. 37, pp. 175–77]. According to Northwestern

Mutual's analysis of the Surgery Schedules, collectively, colonoscopies, endoscopies,

mastectomies, hernia repairs, and non-complex procedures constituted 74.8361% of the

surgical procedures Dr. McEver was scheduled to perform in 2010, and 83.7252% of the

procedures he was scheduled to perform in 2011. [Doc. 42, pp. 13–14]. Northwestern

Mutual later argues that, based on its analysis of Dr. McEver's injury, he can perform

approximately 75–84% of the procedures shown in his 2010 and 2011 Surgery

Schedules. [*Id.*]. Notably, however, Dr. McEver doesn't give as much weight to the

Surgery Schedules as Northwestern Mutual does, stating "[m]ost of the time it [the

surgery schedule for the day] was correct. Sometimes it wasn't correct, depending on

how many cancellations there were." [Doc. 35, p. 178:13–14].

C.    Dr. McEver's Injury & Subsequent Medical Care

Dr. McEver injured his right hand and wrist on Saturday, March 12, 2011, when

he fell on land in Warwick, Georgia that he and some others leased for hunting. [Doc.

35, pp. 146–49]. Initially, his right hand and wrist went numb, and then he had a sharp,

tingling pain for several minutes. [*Id.* at 116–18]. His right thumb and wrist remained

sore for several days. [*Id.*]. Dr. McEver resumed his normal medical practice, including

his full surgical schedule, the following Monday, March 14, 2011. [*Id.* at 118, 149].

By June 2011, Dr. McEver experienced weakness and a pain in his thumb that

affected his ability to grasp. [Doc. 35, pp. 118–19]. Dr. McEver felt a painful and sharp

sensation akin to an electrical shock when he used certain tools such as clamping instruments while operating. [Doc. 35, p. 123]. Additionally, Dr. McEver experienced numbness in his hand which affected his ability to make accurate incisions because he could not sense the force he was putting on scalpels. [Doc. 35, pp. 124–25].

Dr. McEver spoke with Dr. J. W. Spivey, Jr., his friend who is a general orthopedic surgeon in Warner Robins, about three months after he fell. [Doc. 35, p. 150]. Dr. Spivey frequently operated on the same days as Dr. McEver so they would see each other often, and Dr. McEver described their conversation as a "curbside" conversation, likely in the lounge of the hospital where they both operated. [Doc. 35, p. 150]. Dr. McEver then made an appointment with Dr. Spivey and saw him later in June. [Doc. 35, p. 119:7].

Dr. McEver's condition seemed to worsen, so he saw Dr. Spivey again. [Doc. 35, pp. 119–20]. Dr. Spivey recommended Dr. McEver undergo an MRI, which he received on September 2. [Doc. 31-9, pp. 10–11]. By the time Dr. McEver was scheduled for the MRI, he had started asking for help in performing his surgeries, and others had to assist him with complex cases and procedures. [Doc. 35, p. 120]. The MRI showed tendonitis of Dr. McEver's right wrist with tenosynovitis, an inflammation of tendons involved in the function of the thumb. [Doc. 31-9, pp. 10–11]; [Doc. 35, p. 27]. Dr. Spivey diagnosed Dr. McEver as having De Quervain's Tenosynovitis and told Dr. McEver that his options moving forward were to either try a steroid injection or undergo surgery. [Doc.

31-9, p. 8]; [Doc. 35, pp. 120–21]. After discussing his options with Dr. Spivey, Dr. McEver consulted Dr. Thomas Dopson, a general orthopedic surgeon in Atlanta. [Doc. 35, p. 121]. Dr. Dopson agreed with Dr. Spivey that he "probably needed to think about surgical treatment . . . ." [Doc. 35, p. 28]. After Dr. McEver tried the steroid injection but didn't see a difference in pain, he decided to schedule surgery. [Doc. 35, pp. 120–21]; [Doc. 31-9, p. 9].

On September 28, 2011, Dr. Spivey performed a surgery called "De Quervain's release." [Doc. 35, p. 40]; [Doc. 35, p. 46]; [Doc. 35, p. 164]. When tendons that control the thumb and which pass through a sheath in the wrist become irritated, they become inflamed and can affect the superficial branch of the radial nerve that runs on top of and across the same sheath. [Doc. 35, pp. 29–31]. By slitting the sheath, which is what occurs during De Quervain's release, the pressure on the tendons passing through the sheath is relieved allowing the tendons to move freely, the objective being to remove the cause of irritation. [Doc. 35, pp. 31–32]. The superficial branch of the radial nerve passes over the site of the surgery. [Doc. 35, pp. 30–35]; [Doc. 35, p. 90]. Typically, the De Quervain's Release procedure accomplishes the goal of decreasing or eliminating pain and restoring full functionality of the hand. However, the procedure does not resolve the problem in a small percentage of cases, [Doc. 35, pp. 29–36]; [Doc. 35, pp. 40–42], and the process of slitting the sheath may irritate or injure the nerve. [Doc. 35, p. 33].

Dr. McEver's pain decreased after surgery, but he continued to experience a

numb, tingly feeling in his right thumb. [Doc. 35, pp. 121–23]. Dr. Dopson concluded that Dr. McEver's superficial branch of the radial nerve in his hand had been injured during the De Quervain's release because Dr. McEver had dysesthetic feelings after the surgery, a problem he did not have before. [Doc. 35, pp. 33–34, 45–46, 63, 123]. Dr. Dopson testified that once the superficial branch of the radial nerve is injured, it rarely gets better. It does not regenerate itself, and it cannot be repaired. [Doc. 35, pp. 41–42]. As Dr. Dopson put it, "once it's been buggered, it's hard to unbugger." [Doc. 35, p. 39]. Because this nerve was injured during the De Quervain's release, Dr. McEver lost much of the function of his hand and thumb — function that is essential for a general surgeon. Because the surgery caused injury to Dr. McEver's hand, and because Dr. McEver continued to have dysesthetic feelings after the surgery, Dr. Dopson concluded that Dr. McEver should no longer perform surgery. Dr. Dopson reasoned that a surgeon whose nerve was impaired like Dr. McEver's cannot manipulate or control surgical instruments properly. In other words, without full function of his hand and thumb, Dr. McEver could not safely operate on his patients. [Doc. 35, pp. 37–39, 41–43, 64–65].

On October 6, 2011, Dr. Spivey prescribed a hand-wrist brace known as a thumb spica brace for Dr. McEver to wear. [Doc. 31-9, p. 6]; [Doc. 35, pp. 193–95]. Later, on November 9, 2011, Dr. Spivey recommended a home exercise program and that Dr. McEver receive physical therapy. [Doc. 35, pp. 165–66]; [Doc. 31-9, p. 4]. As opposed to working with a trained physical therapist, Dr. McEver testified that he did physical

therapy at home using a handout that Dr. Spivey gave him that "was the same as what [he] would do as a physical therapist." [Doc. 35, p. 168].

Dr. Spivey saw Dr. McEver for several follow-up visits until Dr. Spivey retired in 2012. [Doc. 35, p. 125]. Dr. Dopson also examined Dr. McEver in December after the September surgery because he was still having problems following surgical treatment. [Doc. 35, p. 33]. Dr. Dopson then saw Dr. McEver about once a year after that between 2012 and 2020 and submitted Attending Physician's Statements to Northwestern Mutual in support of Dr. McEver's disability claim.[8] [Doc. 35, p. 84–85, 171]. When Dr. Dopson saw Dr. McEver on December 21, 2011, Dr. Dopson wrote: "If symptoms persist, I recommend he see a hand surgeon regarding the dorsum of the right wrist and the tenosynovitis," [Doc. 31-10, p. 4]; [Doc. 35, pp. 79–81], but Dr. McEver did not see a hand surgeon following this visit.[9]

---

[8] Dr. Dopson examined Dr. McEver and reported those examinations to Northwestern Mutual in October, 2012 [Doc. 31-12], March, 2014 [Doc. 31-13], January, 2016 [Doc. 31-14], and February, 2017 [Doc. 31-15]. He also performed additional examinations that he didn't report to Northwestern Mutual in March and September of 2013 and in November of 2017, 2018, and 2019. [Doc. 35, pp. 51–52, 57–58]. These examinations showed that Dr. McEver's condition had not improved, but had in fact gotten worse over time, and that Dr. McEver continued to be unable to function as a general surgeon from the age of 59 to the age of 66 plus.

[9] Northwestern Mutual argues that Plaintiff did not comply with the requirement under the Disability Policies that Northwestern Mutual will provide disability benefits "only if . . . the insured is under the care of a licensed physician other than himself during the time he is disabled." [Doc. 31-1, p. 4]; [Doc. 31-2, p. 4]; [Doc. 31-3, p. 4]; [Doc. 31-4, p. 5]; [Doc. 31-5, p. 5]; [Doc. 26-1, p. 3]. The Court finds this argument unconvincing. Dr. McEver was under the care of Dr. Dopson, a licensed physician other than himself, from the time Dr. Spivey retired through December 2020. [Doc. 35, p. 125]; [Doc. 35, pp. 45–59]. Dr. Dopson saw Dr. McEver periodically, examined him on each visit, and reviewed and occasionally modified his treatment plan. [Doc. 31-12]; [Doc. 31-13]; [Doc. 31-14]; [Doc. 31-15]. Dr. Dopson also testified that Dr. McEver visited with him, was examined by him, and received treatment recommendations by him in November 2017, November 2018, and November 2019 as well. [Doc. 35, pp.

D.    Dr. McEver's Claim for Disability Benefits & Northwestern Mutual's Evaluation of His Claim

Dr. McEver did not return to work in his medical practice after having surgery on September 28, 2011. [Doc. 35, p. 151]. Dr. McEver submitted his claim for disability benefits to Northwestern Mutual on January 4, 2012. [Doc. 32-1]. After Northwestern Mutual approved his disability benefits claim, Dr. McEver's partners "told [him] that [he] was fired" and that he no longer had a job. [Doc. 35, p. 152]. Dr. McEver reported to Northwestern Mutual that he had become disabled as a general surgeon on September 28, 2011, the date of his surgery. [Doc. 32-1]. Dr. McEver submitted Attending Physician's Statements signed by Dr. Spivey and Dr. Dopson, a copy of Dr. Spivey's operative report, and office records in support of his claim for disability benefits. [Doc. 36, pp. 156–57]; [Doc. 32-1]; [Doc. 31-9]; [Doc. 31-10].

A registered nurse employed by Northwestern Mutual reviewed the documents Dr. McEver submitted and recommended Northwestern Mutual accept his claim for total disability benefits. [Doc. 36, p. 157]. Based on the nurse's recommendation, Northwestern Mutual informed Dr. McEver by letter dated February 8, 2012, that his claim for total disability benefits under his Disability Polices was approved and that he would receive disability benefits retroactive to December 27, 2011, subject to Northwestern Mutual's evaluation of his continued eligibility for benefits. [Doc. 36, p.

---

57–59]. In other words, Dr. McEver satisfied the requirement that he be seen by a licensed physician for purposes of receiving disability benefits.

178]; [Doc. 32-2]. Additionally, Northwestern Mutual informed Dr. McEver by letter dated April 3, 2012, that premiums under his Life Policies were waived, effective September 28, 2011. [Doc. 31-11]. Northwestern Mutual sent Dr. McEver a life insurance premium refund. [Doc. 31-11]; [Doc. 35, p. 130].

The letter informing Dr. McEver that his disability claim had been approved also advised him that Northwestern Mutual would need periodic proof of a continuing disability.[10] [Doc. 36, p. 158]. Patricia Wotnoske, Disability Benefit Specialist and Team Leader for Northwestern Mutual, was responsible for the continuing evaluation of Dr. McEver's claim for disability benefits. [Doc. 36, pp. 152–53]; [Doc. 36, p. 156]. On February 8, 2012, Wotnoske discussed Dr. McEver's claim and his medical records with Dr. Henry Alba, a pain medicine and rehabilitation specialist who was a consultant for Northwestern Mutual. [Doc. 36, pp. 160–61]. Based on Dr. Alba's recommendation, Wotnoske had Dr. McEver's medical records reviewed by Dr. Sanger, a hand surgeon in the Department of Plastic and Reconstructive Surgery at the Medical College of Wisconsin. [Doc. 36, p. 161]; [Doc. 37, p. 103]; [Doc. 32-3].

In a report dated March 15, 2012, Dr. Sanger made several conclusions and findings. [Doc. 32-3]. Specifically, Dr. Sanger noted that Dr. McEver should be seen by a

---

[10] Northwestern Mutual asked Dr. James Sanger to review Dr. McEver's medical records by a letter dated February 13, 2012, that informed Dr. Sanger as follows: "Prior to the onset of disability, the insured was employed as a General Surgeon. *His principal job duty consisted of performing surgery in the OR.*" [Doc. 31-28 (emphasis added)].

hand surgeon, that Dr. McEver's current treatment was inappropriate, and that he

should receive desensitization therapy. Dr. Sanger also concluded that most surgeons in

his position would return to full surgical duty, and that he certainly could work part

time. [*Id.*]. Additionally, Dr. Sanger noted that "[t]his is his dominant hand, and

therefore he may be significantly limited in his ability to do surgery, but he would need

a Functional Capacities Evaluation and a good exam by a good hand surgeon before

this could be determined." [*Id.* at 4]. Finally, Dr. Sanger's report stated that "there are

many things about this case that do not make good sense," and that "[t]he main thing

that stands out here is a total lack of effort to have the patient in a therapy program."

[*Id.* at 5].

Another action Northwestern Mutual took as part of its ongoing analysis of Dr.

McEver's disability was a home interview of Dr. McEver conducted by Jerome Bonney,

Field Benefits Consultant for Northwestern Mutual. [Doc. 37, pp. 185–87]; [Doc. 34-3].

When Bonney asked if he had received physical or occupational therapy, Dr. McEver

said Dr. Spivey had given him the option of having formal physical therapy or doing it

on his own at home, and that he had elected to do it on his own. [Doc. 37, p. 191]; [Doc.

34-3]. Dr. McEver later said he was no longer doing physical therapy because "he was

advised he no longer needed to do it." [Doc. 37, pp. 191, 193]; [Doc. 34-3]. He also said

he had not sought formal physical or occupational therapy because "[h]e didn't feel that

he needed it." [Doc. 37, pp. 191, 193]; [Doc. 34-3]. Additionally, Dr. McEver told Bonney

he stopped wearing his hand and wrist brace in March 2012, and "although he didn't need to wear it," he put the brace on when "doing any pulling or lifting with his hand" and "if he was out weeding in his yard." [Doc. 37, pp. 192–93]; [Doc. 34-3].

As recommended by Dr. Sanger, Northwestern Mutual scheduled an independent medical examination ("IME") of Dr. McEver, which Dr. Craig Weil, an orthopedic hand surgeon in Atlanta, conducted on October 25, 2012.[11] [Doc. 36, pp. 71, 163–64]; [Doc. 37, pp. 20, 26]; [Doc. 32-4]. During that examination, Dr. Weil discussed with Dr. McEver "[t]he importance of complying with the treatment program . . . ." [Doc. 32-4, p. 5]. Dr. Weil also recommended that Dr. McEver have a Functional Capacity Evaluation ("FCE") and an electromyography and nerve conduction study ("EMG/NCV"). [Id.]. In an addendum report dated December 18, 2012, Dr. Weil told Northwestern Mutual that Dr. McEver's "functional limitations [did] not appear to be substantial," that "he should be able to work to some capacity, certainly part-time if not full time," and that "[h]e should be able to work an 8-hour day or more." [Doc. 32-5]. He also wrote that Dr. McEver "may benefit from an FCE and EMG-NCVs." [Id.]. Dr. Sanger testified that if a patient reports pain and nerve problems after De Quervain's surgery, a treating physician normally would obtain EMG testing and nerve conduction studies. [Doc. 37, p. 114]. Those studies are "two separate ways of evaluating nerves,"

---

[11] By letter dated October 8, 2012, Northwestern Mutual engaged Dr. Craig Weil to examine Dr. McEver and report on his condition. The letter informed Dr. Weil that Dr. McEver's "principal job duties consisted of performing surgeries in the O.R." [Doc. 31-31, p. 1].

which are intended to quantify the problem and to provide information that would be helpful in treating the problem. [*Id.* at 115]. Neither Dr. Spivey nor Dr. Dopson arranged for Dr. McEver to have EMG/NCV testing. [Doc. 36, pp. 97–98].

In addition to reviewing Dr. McEver's medical records, interviewing him at his home in Warner Robins, and conducting an independent medical evaluation, Northwestern Mutual arranged a Functional Capacity Evaluation of Dr. McEver and reviewed video surveillance of Dr. McEver walking to the Functional Capacity Evaluation and doing other activities recorded on camera. [Doc. 34-5]; [Doc. 34-6]; [Doc. 34, Surveillance Video, Exhibit D-52 (uploaded to the Digital Evidence Vault)]. Marlyn Jasper, a physical therapist in Macon, conducted the Functional Capacity Evaluation of Dr. McEver on April 25, 2013. [Doc. 34-5]. Dr. McEver told Ms. Jasper that "he wears his right thumb spica wrist splint when outside his home or when performing any tasks that involve gripping, pulling, pushing, carrying or lifting at home." [*Id.* at 2]. However, video surveillance showed Dr. McEver carrying the brace in his left hand as he walked from his car to Ms. Jasper's office. Surveillance also showed that Dr. McEver opened doors to buildings and the door to his vehicle with his right hand, and that he pumped gas with his right hand, all with no apparent signs of discomfort or pain avoidance.[12]

---

[12] Dr. Sanger opined that the results of the grip testing—which was part of the FCE—potentially indicated a "lack of effort" on Dr. McEver's part because he did not develop a Bell-shaped curve on either hand. A Bell-shaped curve is the standard result and depiction of a "good" or healthy hand—and it is unusual to see a flat curve on the uninjured or uninvolved hand. [Doc. 37, pp. 121–22]. And although the FCE reported noted reduced grip strength and reduced pinch strength in Dr. McEver's right hand, Dr. Sanger testified that that would not prevent Dr. McEver from working as a general surgeon. [Doc. 37, p. 124].

17

[Doc. 34-6]; [Doc. 34, Surveillance video, Exhibit D-52 (uploaded to the Digital Evidence Vault)].

     E.    <u>Northwestern Mutual's Determination that Dr. McEver was Partially Disabled, Not Totally Disabled</u>

On March 16, 2014, after receiving input from Dr. Alba, Dr. Weil, and Dr. Sanger, Wotnoske recommended to her supervisor, Assistant Director Sharon Hyde, that Dr. McEver be approved for partial disability benefits and not total disability benefits. [Doc. 36, p. 169]; [Doc. 36, p. 171]; [Doc. 34-11]. Hyde agreed, and Ms. Wotnoske informed Dr. McEver by letter dated March 31, 2014, that he was no longer was eligible for total disability benefits, but that he met the contractual requirements for partial disability, based on evidence Dr. McEver was "able to perform some, but not all, of the surgeries [he] had performed prior to the onset date of disability." [Doc. 36, pp. 172–73]; [Doc. 32-7, p. 4].

As a result, Northwestern Mutual paid partial disability benefits through the maximum benefit period of each Disability Policy—to each policy anniversary following Dr. McEver's 65th birthday. [Doc. 36, pp. 139–40]. Because Dr. McEver was not working and earning income, partial disability benefits were paid in the same monthly amounts Dr. McEver had received as total disability benefits. [*Id.* at 133]. From

---

Like Dr. Sanger, Dr. Weil was also suspicious that Dr. McEver may not have been trying to comply with the tests, because most people use pinch when driving a car or opening a door, yet Dr. McEver's pinch-test scores were zero in each instance. [Doc. 37, pp. 35–38].

the time Northwestern Mutual first paid disability benefits to Dr. McEver until the last payment in 2019, he received disability insurance benefits "just shy of $1.6 million." [*Id.* at 139–40]. Wotnoske also informed Dr. McEver that he was no longer eligible for waiver of life insurance premiums because he was not totally disabled, as required by the Life Policies. [Doc. 36, pp. 172–73]; [Doc. 32-7].

Wotnoske spoke with Dr. McEver by telephone on April 4, 2014, about the claim decision. [Doc. 36, pp. 173–74]; [Doc. 34-12]. Dr. McEver said he was disappointed by the decision that Northwestern Mutual had determined that he was not totally disabled because he had let his surgical certificate expire, which he would not have done had he known the decision earlier. [Doc. 36, pp. 173–74]; [Doc. 34-12]. He noted he had been "out of the game" so long that he would need to "recreate himself" to return to work. [Doc. 34-12]. He also said he was receiving Social Security disability benefits, which had a limit on how much income he could earn. [Doc. 36, pp. 173–74]; [Doc. 34-12]. When Wotnoske told Dr. McEver he had the right to appeal the decision that he was partially disabled, not totally disabled, Dr. McEver said he "wasn't going to fight the decision and wanted to confirm that he would continue to receive benefits to age 65." [Doc. 36, pp. 174–75]; [Doc. 34-12].

F.    Dr. McEver's Post-Retirement Activities

Although Dr. McEver is unable to do surgery, he remains able to interact with patients through means such as examining patients, ordering or reviewing diagnostic

tests, making diagnoses, or developing treatment plans. [Doc. 36, pp. 10–12]. Dr.

McEver renewed his license to practice medicine in 2021. [Doc. 36, pp. 93–94]. And since

retiring, Dr. McEver has done volunteer work for which he is not paid (and which did

not reduce his disability benefits), such as serving on the Board of Directors of the

Houston County Volunteer Medical Clinic, which provides medical care to persons

who are not eligible for Medicare or Medicaid. [Doc. 36, pp. 27–29].

Outside of volunteering, Dr. McEver has engaged in several activities for leisure

during his retirement. He still hunts on his hunting property, [Doc. 35, pp. 148–49],

plays golf in an annual charity golf tournament, [Doc. 35, p. 140], and gardens, [Doc. 35,

p. 197]. Dr. McEver has also traveled around the world with his wife since he stopped

practicing medicine in September 2011. [Doc. 36, pp. 32–34]; [Doc. 34-38, ¶ 14]; [Docs.

34-22 to 34-35].

## CONCLUSIONS OF LAW

A.    <u>Legal Standard</u>

1.    *Federal Rule of Civil Procedure 52*

In rendering judgment following a nonjury trial, Rule 52(a) requires a court to

"find the facts specially and state its conclusions of law separately." Fed. R. Civ. P.

52(a). "Findings of fact must be sufficient to allow the reviewing court 'an opportunity

to engage in meaningful appellate review.'" *FTC v. On Point Cap. Partners, LLC*, 17 F.4th

1066, 1080 (11th Cir. 2021) (quoting *Danley v. Allen*, 480 F.3d 1090, 1091 (11th Cir. 2007)).

Although Rule 52(a) "requires specific findings of fact, it does not require a finding on

every contention raised by the parties." *Feazell v. Tropicana Prods., Inc.*, 819 F.2d 1036,

1042 (11th Cir. 1987). "A 'judge need only make brief, definite, pertinent findings and

conclusions upon the contested matters; there is no necessity for overelaboration of

detail or particularization of facts.'" *On Point Cap. Partners*, 17 F.4th at 1081 (quoting

*Stock Equip. Co. v. Tenn. Valley Auth.*, 906 F.2d 583, 592 (11th Cir. 1990)). "So long as there

is 'sufficient record evidence to support the findings, [district courts] need not state the

evidence or any of the reasoning upon the evidence.'" *Id.* (alteration in original)

(quoting *Stock Equip. Co.*, 906 F.2d at 592).

  This Court's conclusions of law are subject to *de novo* review, but its "findings of

fact—including determinations of the credibility of witnesses and weight of the

evidence—will not be set aside unless they are clearly erroneous." *Sidman v. Travelers*

*Cas. & Sur.*, 841 F.3d 1197, 1201 (11th Cir. 2016) (quoting *Fischer v. S/Y Neraida*, 508 F.3d

586, 592 (11th Cir. 2007)). "In a case in which the evidence is largely testimonial, like this

one, the district court has the advantage of observing the witnesses and evaluating their

credibility firsthand . . . ." *Id.* (quoting *Fischer*, 508 F.3d at 592). Thus, when "fact

findings are based on credibility determinations [the reviewing court] must give 'even

greater deference to the trial court's findings; for only the trial judge can be aware of the

variations in demeanor and tone of voice that bear so heavily on the listener's

understanding of and belief in what is said.'" *Jemison v. Simmons*, 518 F. App'x 882, 888

(11th Cir. 2013) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). Accordingly, as the Eleventh Circuit has recognized, "[i]n a bench trial, the district court judge . . . is itself the finder of fact, and we owe to it the same deference in assessing the credibility of . . . testimony that we would owe to a jury." *Bellitto v. Snipes*, 935 F.3d 1192, 1209 (11th Cir. 2019). *League of Women Voters of Fla., Inc. v. Lee*, No. 4:21CV186-MW/MAF, 2022 WL 969538, at *4 n.6 (N.D. Fla. Mar. 31, 2022).

  2.  *Georgia Law*

  "In diversity cases, the Court is bound by the applicable state law governing the contract, in this case Georgia law." *Giddens v. Equitable Life Assur. Soc. of U.S.*, 445 F.3d 1286, 1297 n.9 (11th Cir. 2006); *Clanton v. Inter.Net Global, L.L.C.*, 435 F.3d 1319, 1323 (11th Cir. 2006).

  Rules governing the construction of a contract apply to insurance contracts. *Wilson v. S. Gen. Ins. Co.*, 180 Ga. App. 589, 590, 349 S.E.2d 544, 545 (1986). In interpreting the language of the Policies at issue, the Court must apply Georgia rules of contract construction. *Provau v. State Farm Mut. Auto. Ins. Co.*, 772 F.2d 817, 819 (11th Cir. 1985) ("The construction of insurance contracts is governed by substantive state law.") (citing *Dempsey v. Auto Owners Ins. Co.*, 717 F.2d 556, 559 (11th Cir. 1983)). The interpretation and construction of an insurance contract, including the determination and resolution of ambiguities, is a question of law for the court to decide. O.C.G.A. § 13-2-1; *Claussen v. Aetna Cas. & Sur. Co.*, 888 F.2d 747, 749 (11th Cir. 1989). "As in any

dispute over insurance coverage, the Court begins by examining the source of coverage itself—the general promises of coverage made in the insurance policy." *Allstate Ins. Co. v. Harkleroad*, No. 409CV011, 2010 WL 2076941, at *4 (S.D. Ga. May 24, 2010) (quoting *Macon Iron & Paper Stock Co. v. Transcon. Ins. Co.*, 93 F. Supp. 2d 1370, 1372 (M.D. Ga. 1999)).

"[T]he cardinal rule of contract construction is to ascertain the intention of the parties." *Garrett v. S. Health Corp. of Ellijay, Inc.*, 320 Ga. App. 176, 739 S.E.2d 661, 667 (2013) (alteration in original) (quoting *Bd. of Comm'rs of Crisp Cnty. v. City Comm'rs of Cordele*, 315 Ga. App. 696, 699, 727 S.E.2d 524, 527 (2012)). "When the terms of an insurance contract are clear and unambiguous, the policy terms alone determine the intent of the contracting parties." *Pomerance v. Berkshire Life Ins. Co. America*, 288 Ga. App. 491, 493, 654 S.E.2d 638 (citing *N. Metro Directories Publ'g v. Cotton States Mut. Ins. Co.*, 279 Ga. App. 492, 494(1), 631 S.E.2d 726 (2006)). "[N]o construction is required or even permitted when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation . . . ." *Shepherd v. Greer, Klosic & Daugherty*, 325 Ga. App. 188, 750 S.E.2d 463, 465 (2013) (alteration in original omitted) (quoting *Homelife Cmtys. Grp. v. Rosebud Park, LLC*, 280 Ga. App. 120, 633 S.E.2d 423, 425 (2006)). Words in a contract generally bear their usual and common meaning. O.C.G.A. § 13-2-2(2).

If, however, the contractual language is susceptible to two or more reasonable

constructions, Georgia's statutory rules of contract construction must be applied to resolve the ambiguity. *Hurst v. Grange Mut. Cas. Co.*, 266 Ga. 712, 716(4), 70 S.E.2d 659 (1996). "Where an insurance contract is ambiguous or is capable of being construed variously, it must be construed against the insurer and in favor of the insured." *Erie Indem. Co. v. Lascala*, 206 Ga. App. 283, 284, 424 S.E.2d 820, 822 (1992). Indeed, "[p]olicies of insurance will be liberally construed in favor of the object to [be] accomplished, and conditions and provisions therein will be strictly construed against the insurer, as they are issued upon printed forms, prepared by experts at the insurer's instance, in the preparation of which the insured has no voice." *Davis v. United Am. Life Ins. Co.*, 215 Ga. 521, 111 S.E.2d 488, 492 (1959) (citation omitted). Georgia courts instruct that disability provisions should be given a "practical and reasonable" construction and not a "strict and literal" one. *John Hancock Mut. Life Ins. Co. v. Poss*, 154 Ga. App. 272, 276, 267 S.E.2d 877, 881 (1980) (citation omitted); *Giddens*, 445 F.3d at 1297. Nevertheless, "[t]he courts have no more right or power, by construction, to extend the coverage of a policy or to make it more beneficial to the insured than they do to rewrite the contract and increase the coverage." *Parris & Son, Inc. v. Campbell*, 128 Ga. App. 165, 171–72, 196 S.E.2d 334, 339 (1973). An insurance contract must be construed as a whole with all the provisions interpreted so as to harmonize with each other. *Chanin v. Tharrington*, 222 Ga. App. 890, 476 S.E.2d 651, 652 (1996).

There are two general types of individual disability insurance contracts: (1)

occupational disability policies, and (2) non-occupational disability policies. *Parker v. Prudential Ins. Co. of Am.*, 224 Ga. App. 865, 868, 482 S.E.2d 483, 485 (1997); *Mut. Life Ins. Co. v. Barron*, 198 Ga. 1, 5–6, 30 S.E.2d 879 (1944). An occupational disability policy provides benefits if the insured is disabled from fulfilling the duties of a particular occupation. *Parker*, 224 Ga. App. at 868; *Barron*, 198 Ga. at 5–6. A non-occupational disability policy provides benefits if the insured is disabled or prevented from engaging in any occupation or gainful activity. *Parker*, 224 Ga. App. at 868; *Barron*, 198 Ga. at 5–6. Georgia law recognizes that there is a fundamental difference between these two types of insurance contracts and the risk the insurer assumes. *Barron*, 198 Ga. at 5. The Policies at issue in this case are occupational disability policies. Nevertheless, the Court finds that Georgia case law on the construction of both occupational and non-occupational disability policies is helpful in construing the present policies.

B.   The Preponderance of the Evidence Shows Dr. McEver is Totally Disabled Under the Disability Policies

The language at issue in the Disability Policies is plain and unambiguous. As noted earlier, the Disability Policies define "Total Disability" as the inability "to perform the principal duties of his occupation." [Doc. 26-1, p. 3]; [Doc. 31-1]; [Doc. 31-2]; [Doc. 31-3]; [Doc. 31-4]; [Doc. 31-5]. Dr. McEver's Policies protect him against disability from "his occupation" and do not require that Dr. McEver be disabled from "any" occupation or "comparable" occupations until the end of the "Initial Period." Then, "[a]fter the end of the Initial Period, the Insured is totally disabled when he is unable to

25

perform the principal duties of his occupation and is not gainfully employed in any occupation." [Doc. 26-1, p. 3]; [Doc. 31-1]; [Doc. 31-2]; [Doc. 31-3]; [Doc. 31-4]; [Doc. 31-5]. An insured is partially disabled when "he is unable to perform one or more of the principal duties of his occupation; or to spend as much time at his occupation as he did before the disability started" *and* "he has at least a 20% Loss of Earned Income." [Doc. 31-1, p. 4]; [Doc. 31-2, p. 4]; [Doc. 31-3, p. 4]; [Doc. 26-1, p. 3]. Read together, these provisions provide that an insured may have more than one principal duty, and that an insured is not totally disabled when he may still perform at least one or more of his principal duties. [Doc. 26-1, p. 3]; [Doc. 31-1]; [Doc. 31-2]; [Doc. 31-3]; [Doc. 31-4]; [Doc. 31-5].

In this context, the word principal means "most important, consequential, or influential." *Principal*, Merriam-Webster.com Dictionary (2022). The word "duty" means "obligatory tasks, conduct, service, or functions that arise from one's position (as in life or in a group)." *Duty*, Merriam-Webster.com Dictionary (2022). *See Crumbliss v. Nw. Mut. Life Ins. Co.*, 455 F. Supp. 3d 1376, 1382 (N.D. Ga. 2020) (citing *Pomerance*, 288 Ga. App. At 494, 654 S.E.2d 638 (using Merriam-Webster's Online Dictionary to determine the commonly accepted meanings of undefined terms in an insurance contract)); *Wade v. Allstate Fire & Cas. Co.*, 324 Ga. App. 491, 493, 751 S.E.2d 153 (2013) (same). It follows that an insured who is capable of carrying on in his former occupation after the onset of the alleged disability cannot be "totally disabled" within the meaning of the policy. *See*

26

*Crumbliss*, 455 F. Supp. 3d at 1382.

Here, the preponderance of the evidence shows that Dr. McEver was totally disabled under the Disability Policies because he could *not* carry on in his former occupation after the onset of his disability. And, the Court finds by a preponderance of the evidence that he remains totally disabled under the Disability Policies for the same reason. As Northwestern Mutual noted in its early correspondence to Dr. Weil, Dr. McEver's "principal job duties consisted of performing surgeries in the [operating room]." [Doc. 31-31, p. 1]. In other words, Dr. McEver's principal duty as a surgeon was to operate, and if he can't operate like he could before the injury, then he can't perform the principal duties of his job. That makes him "totally disabled" under the Disability Policies.

During the trial, the parties focused the bulk of their respective evidentiary presentations and arguments on which duties and even specific surgeries Dr. McEver may or may not have been able to perform had he continued working after his injury and surgical procedure. Those arguments warrant some discussion here.

Dr. McEver and Dr. Dopson described his principal duties in broad strokes, characterizing the duties of his occupation as being totally related to surgery and noting that nothing he does is unrelated to surgery. Dr. Dopson clearly advised Dr. McEver that he could no longer perform surgeries. After all, Dr. McEver lost full function of his hand and thumb and Dr. Dopson thought he could no longer safely operate on his

27

patients. Dr. McEver's nerve in his hand suffered an injury during the De Quervain's procedure that, according to Dr. Dopson, never really goes away. It's important to note that Dr. McEver did not prove—and does not contend—that he could not perform every duty that may be associated with general surgery. Instead, based on Dr. Dopson's opinion and knowledge (and of course his own pain and personal knowledge), Dr. McEver contends that he cannot perform surgery—any surgery—due to his injury which would have affected the way he handled instruments and caused pain or issues when he wore gloves. Dr. Dopson believed that Dr. McEver could not return to work as a general surgeon because his nerve condition "dramatically" affected his ability to perform surgery. [Doc. 35, p. 42]. Dr. Dopson also testified that "[he doesn't] know of anybody that wants a surgeon to be 10 percent or 50 percent or 70 percent. They want their surgeons to be 100 percent, and clearly Dr. McEver was not." [Doc. 35, p. 43].

Northwestern Mutual, on the other hand, is predictably much narrower in its focus and analysis. For example, at one point during the ongoing evaluation of Dr. McEver, Dr. Weil reported to Northwestern Mutual that Dr. McEver's "functional limitations did not appear to be substantial," that "he should be able to work to some capacity, certainly part-time if not full time," and that "he should be able to work an 8-hour day or more." [Doc. 32-5]. Dr. Weil also noted: "I believe he can do many of his procedures as a general surgeon . . . . I think that he could do certain colonoscopies and endoscopies . . . . Whatever he felt comfortable with . . . . I wouldn't expect him to be

doing open gallbladders and so forth, you know, very strenuous operations . . . . But since he does a lot of laparoscopic surgeries he might have been able to perform some of that. But even that is something that you have to feel comfortable with because those are not easy operations by any means." [Doc. 37, pp. 47–49].

Dr. Sanger wrote the following in her report as part of the ongoing evaluation of Dr. McEver: "It may be that he could have his strength built up so that he could complete a full day of work; however, it is reasonable to assume, based on these studies, that probably he could do 50% of his surgery. He would have no limitation on physical exams or rounding." [Doc. 32-6]. And after analyzing the Surgery Schedules, Northwestern Mutual concluded that "Dr. McEver is capable of performing approximately 75–83% of the procedures shown in his Surgery Schedules." [Doc. 42, pp. 13–14]; [Doc. 37, pp. 47–50]; [Doc. 37, pp. 134–40].

Notwithstanding this narrower focus, the Court cannot ignore Northwestern Mutual's letter to Dr. McEver dated March 31, 2014, which stated: "For claim purposes, we have established that your only principal duty was surgery." [Doc. 32-7, p. 1].

As outlined above, Dr. McEver's evidence established his inability to perform most of his important duties and an inability to engage in his general surgery occupation when compared to his pre-injury practice. Dr. McEver's ability to take medical histories, conduct physical examinations, review x-rays, or make diagnoses in isolation would not allow him to continue in his general surgery occupation. *See*

*Giddens*, 445 F.3d at 1298–99 (citing *Dowdle v. Nat'l Life Ins. Co.*, 407 F.3d 967, 970 (8th Cir. 2005) (concluding that surgeon who could no longer stand long enough to perform orthopedic surgery but could conduct office visits, see patients, read x-rays, perform IMEs, interpret data, and promote referrals was totally—not residually—disabled because he could not perform "the most important substantial and material duty")).

The Seventh Circuit case of *McFarland v. General American Life Insurance Company*, 149 F.3d 583, 587–88 (7th Cir. 1998), provides a helpful analogy. In discussing whether the insured was partially or totally disabled under a similar policy, the court compared the insured to a baseball player, specifically a shortstop:

> [I]f a shortstop, whose principal duties include running, hitting, catching and throwing, were injured such that he could no longer throw, he would be totally disabled because he could no longer be employed as a shortstop. Even though the shortstop could still run, hit and catch (a significant portion of his duties), throwing is an essential function for a shortstop and thus the inability to throw means that he is unable to perform "the material and substantial duties" of his occupation. He would be totally disabled because he could no longer perform a core or essential duty of his regular occupation. However, . . . if the shortstop was a good hitter and happened to be in a league that allowed him to act as a designated hitter (the American league), then he would not be totally disabled because he would still be capable of maintaining his employment as a baseball player, his "regular occupation."

*Id.* at 587.

Let's apply the shortstop analogy to Dr. McEver. A good shortstop must be able to field, run, hit, and communicate with the other infielders, but he really can't be an effective shortstop if he can't throw. And just because Dr. McEver can review x-rays,

make diagnoses, see patients in the office, visit patients postoperative in the hospital, or provide second opinions, he really can't be an effective surgeon if he can't safely operate. While a shortstop that can hit could potentially remain in the game as a designated hitter, no shortstop gets to play the field with a designated thrower. That's because if you can't throw, you're just not a shortstop. While Dr. McEver can do a lot of things that surgeons do, he can't have a designated operator to actually perform the operations he can no longer perform. And just like a ballplayer who can't throw can't be a shortstop, a doctor who can't operate can't be a surgeon.

The Court considered the dueling expert opinions and the testimony of the witnesses, and it spent a considerable amount of time researching the applicable law. For the foregoing reasons, the Court exercises its considerable discretion as the factfinder in a bench trial, and finds Dr. McEver to be totally disabled under the Disability Policies so that he is entitled to receive their applicable monthly disability payments.

C.    Waiver of Life Insurance Premiums

In addition to his claim that Northwestern Mutual should have determined him totally disabled under the Disability Polices, Dr. McEver also claims that he should be entitled to the waiver of premium benefits subject to the provisions of the Life Policies. [Doc. 1-1, p. 7, ¶¶ 41–45]. Similar to the provisions of the Disability Policies, Dr. McEver's premium benefits claim depends upon the definition of total disability.

Having determined that Dr. McEver has established he is totally disabled under the Disability Policies, we now turn to the specific terms of the Life Polices.

As noted earlier, the Life Policies provide waiver of benefits subject to the following provisions: "If total disability of the Insured starts on or before the policy anniversary nearest his 60th birthday, the Company will waive all premiums that come due on the policy as long as the total disability continues," but, "[i]f total disability of the Insured starts after the policy anniversary nearest his 60th birthday, the Company will waive those premiums that come due on the policy as long as the total disability continues, but only to the policy anniversary that is nearest his 65th birthday." [Doc. 26-1, p. 4]; [Doc. 31-6, p. 21]; [Doc. 31-7, p. 20]; [Doc. 31-8, p. 18]. And again, the Life Polices defined total disability as "one which prevents the Insured from engaging in an occupation. For the first 24 months of total disability, an occupation is the one that the Insured had at the time he became disabled. After 24 months, an occupation is one for which the Insured is qualified by education, training or experience. Due regard will be given to his vocation and earnings before he became disabled." [Doc. 26-1, p. 4]; [Doc. 31-6, p. 21]; [Doc. 31-7, p. 20]; [Doc. 31-8, p. 18].

Dr. McEver received the waiver of premium benefits for the first 24 months of his disability, and an additional 8–18 months depending on the policy as outlined in Wotnoske's letter to Dr. McEver dated March 31, 2014. [Doc. 31-11]; [Doc. 32-7, p. 1]; [Doc. 32-7, p. 4]. Therefore, only the second part of the definition is relevant here—that

is—whether Dr. McEver has a total disability that prevents him from engaging in an occupation for which he is "qualified by education, training, or experience." [Doc. 26-1]; [Doc. 31-6]; [Doc. 31-7]; [Doc. 31-8]. On this point, the Life Policies language states that "[d]ue regard will be given to his vocation and earning before he became disabled." [Doc. 26-1]; [Doc. 31-6]; [Doc. 31-7]; [Doc. 31-8].

The Court finds Dr. McEver totally disabled in a manner that prevents him from engaging in an occupation for which he is "qualified by education, training or experience." [Doc. 26-1]; [Doc. 31-6]; [Doc. 31-7]; [Doc. 31-8]. The Court admits that this question—whether Dr. McEver could engage in another occupation for which he is qualified under the Life Policies—is a tougher one to answer than whether he is totally disabled under the Disability Policies. Without consideration of Dr. McEver's previous income, the Court would likely have found in favor of Northwestern Mutual. However, the Life Policies Northwestern Mutual drafted require that "[d]ue regard will be given to his vocation and earning before he became disabled." [Doc. 26-1]; [Doc. 31-6]; [Doc. 31-7]; [Doc. 31-8]. And, of course, since the Court must give all parts of the Life Policies due consideration, it must consider Dr. McEver's previous earnings. *See Chanin*, 222 Ga. App. 890, 476 S.E.2d at 652 (noting an insurance contract must be construed as a whole with all the provisions interpreted so as to harmonize with each other); *Giddens*, 445 F.3d at 1299–300 (noting "how Georgia courts liberally construe disability policies in favor of insureds and strictly against insurers").

Before he stopped practicing surgery in September 2011, Dr. McEver earned

$598,022.00 in 2009, $492,387.00 in 2010, and $446,978.00 in 2011. [Doc. 34-16]; [Doc. 34-

17]; [Doc. 34-18]; [Doc. 36, pp. 59–60]. Dr. McEver's only professional education was in

medicine and surgery, and he has never been engaged in any other occupation or

profession. [Doc. 36, pp. 114–15]; [Doc. 36, pp. 84–85]. There simply isn't any evidence

that Dr. McEver could make anywhere near $500,000.00 yearly doing anything else

given the fact that he is trained as a surgeon. Dr. McEver could not find a comparable

job, and Northwestern Mutual hasn't offered any sufficient evidence to rebut that

conclusion. The Court finds that Dr. McEver is totally disabled under the Life Policies

and is thus entitled to a refund of premiums that should have been waived as well as

waiver of benefits without interruption as long as Dr. McEver remains unable to

perform the principal duties of a general surgeon under the Life Policies.

E.    Dr. McEver's Bad Faith Claims

Despite the fact that Dr. McEver has convinced the Court that the denial of his

claims for total disability and waiver of premium benefits under his Disability and Life

Policies was incorrect, his claim for a bad faith penalty and attorney's fees under

O.C.G.A. § 33-4-6 fails.

O.C.G.A. § 33-4-6 provides, in relevant part:

(a) In the event of a loss which is covered by a policy of insurance and the
refusal of the insurer to pay the same within 60 days after a demand has
been made by the holder of the policy and a finding has been made that
such refusal was in bad faith, the insurer shall be liable to pay such holder,

in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer.

Under this provision, "'[b]ad faith' is shown by evidence that, under the terms of the policy . . . the insurer had no 'good cause' for resisting and delaying payment." *Ga. Int'l Life Ins. Co. v. Harden*, 158 Ga. App. 450, 455, 280 S.E.2d 863, 866 (1981). A bad faith refusal to pay means "a frivolous and unfounded denial of liability." *Progressive Cas. Ins. Co. v. Avery*, 165 Ga. App. 703, 706, 302 S.E.2d 605, 607 (1983).

Where there is a disputed question of fact concerning whether an insurer had "a reasonable and probable cause for refusing to pay a claim," a bad faith penalty is not available under O.C.G.A. § 33-4-6. *Shaffer v. State Farm Mut. Auto. Ins. Co.*, 246 Ga. App. 244, 245, 540 S.E.2d 227, 228 (2000).

> To support a cause of action under O.C.G.A. § 33-4-6, the insured bears the burden of proving that the refusal to pay the claim was made in bad faith. A defense going far enough to show reasonable and probable cause for making . . . [the refusal] would vindicate the good faith of the company as effectually as would a complete defense to the action. Penalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim *and where there is a disputed question of fact.*

*Moon v. Mercury Ins. Co. of Ga.*, 253 Ga. App. 506, 507, 559 S.E.2d 532, 534–35 (2002) (quoting *S. Fire & Cas. Co. v. N.W. Ga. Bank*, 209 Ga. App. 867, 434 S.E.2d 729, 730 (1993)).

Here, Northwestern Mutual never denied that Dr. McEver had a disabling condition. The only question was whether he was totally disabled or partially disabled.

35

The answer did not affect the amount of the monthly disability benefit paid to Dr.

McEver, but whether he was eligible to receive those disability benefits for his lifetime

or to each policy anniversary after he attained age 65.

In resolving that issue, Northwestern Mutual relied on evidence which included

(a) an independent medical examination by Dr. Weil, a specialist in hand surgery, (b)

reports by Dr. Sanger, a second expert in hand surgery, and (c) multiple consultations

with Dr. Alba, who provided analysis and opinions during the claim process. Absent a

patently wrong IME or evidence of pretext, the advice of an independent medical

examiner "provides a reasonable basis for an insurer's denial of a claim." *Haezebrouck v.

State Farm Mut. Auto. Ins. Co.*, 216 Ga. App. 809, 811, 455 S.E.2d 842, 844–45 (1995); *Neal

v. Superior Ins. Co.*, 208 Ga. App. 827, 432 S.E.2d 253, 254 (1993) (insurer's reliance on

advice of licensed physician was reasonable as a matter of law).

In *Haezebrouck*, the plaintiff alleged a bad faith breach of her insurance contract,

based on her insurer's failure to pay for medical devices her doctor had recommended

following a car accident. 216 Ga. App. at 809. The insurer had the claim reviewed by

two independent medical experts, each of whom concluded the devices were not

medically necessary. *Id.* at 810–11. The court held that a bad faith penalty was not

recoverable, noting that an insurer's reliance on the advice of an independent physician

is reasonable unless the advice was patently erroneous. *Id.* at 811–12.

Here, both Dr. Weil and Dr. Sanger explained the medical grounds for their

opinions, both in their original reports, in supplemental reports after they reviewed additional evidence, and in their testimony at trial, where they were subject to cross-examination. Northwestern Mutual asked Dr. Sanger, Dr. Weil, and Dr. Alba to review new information as it was received, including the FCE report and surveillance video, and each of them responded to the new information, either in supplemental written reports explaining their reasoning (Dr. Sanger and Dr. Weil) or in additional discussions with Ms. Wotnoske (Dr. Alba).

Although the Court has found that Dr. McEver was totally disabled and not partially disabled, Northwestern Mutual did not reach its conclusion to the contrary in bad faith. As a result, Dr. McEver's bad faith claim fails.

## CONCLUSION

Based on the foregoing Findings of Fact and Conclusions of Law, the Court finds that Dr. McEver was and is totally disabled under both the Disability and Life Policies, but that Northwestern Mutual did not conclude that Dr. McEver was partially disabled instead of totally disabled in bad faith. Accordingly, the Court **ORDERS** both parties to submit a proposed judgment that includes, at a minimum, the specific amount of money Plaintiff is owed under the Disability and Life Policies. The proposed judgment must be filed no later than noon on September 21, 2022.

**SO ORDERED** this 15th day of September, 2022.

*[signature on following page]*

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**